KENT MARKUS, OH Bar # 16005
Enforcement Director
ELIZABETH BOISON, DC Bar # 488072
(Email: elizabeth.boison@cfpb.gov)
(Phone: 202-435-7369)
MELANIE HIRSCH, DC Bar # 989310
(Email: melanie.hirsch@cfpb.gov)
(Phone: 202-435-7944)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

KENT KAWAKAMI, CA Bar # 149803 – Local Counsel
(Phone: 213-894-4858)
(Email: Kent.Kawakami@usdoj.gov)
United States Attorney's Office
Central District of California - Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: (213) 894-2380

Attorneys for Plaintiff
Consumer Financial Protection Bureau

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>Najia Jalan (a/k/a Sarah Johnson, Sarah or Sara St. John, Sarah Kim, Najia Jalah, Sarah John, Sarah Love, or Najia Ebrahimi, and d/b/a National Legal Help Center, NationalLegalHelp.com, National Legal Assistance, Legal Modification Firm CP, First Class Doc Prep, Williams Law Center JW, Williams Litigation Center / Cash | Case No. SACV12-02088 AG (ANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER WITH AN ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

1   Entertainment and Najia Jalan), an
    individual;

2

3   National Legal Help Center, Inc. (f/k/a
    iModify Law, Inc., and d/b/a National

4   Legal Help Center,
    NationalLegalHelp.com, National Legal

5   Help Center EP, National Consumers

6   Bank & Trust, First Class Doc Prep /
    NCHC, and National Legal Help Center

7   HB), a corporation;

8

9   and

10  Richard K. Nelsen (a/k/a Richard or

11  Rick Nelson, and d/b/a/ National Legal
    Help Center, NationalLegalHelp.com,

12  National Legal Assistance, First Class
    Doc Prep, National Consumers Help

13  Center, and Williams Litigation Center /

14  Cash Entertainment), an individual;

15

        Defendants.

16

**(FILED UNDER SEAL)**

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................. 1

II.     PLAINTIFF ..................................................................... 3

III.    DEFENDANTS ............................................................... 5

    A. Najia Jalan ................................................................ 5

    B. National Legal Help Center, Inc. ............................. 7

    C. Richard K. Nelsen ................................................... 8

IV.     DEFENDANTS' BUSINESS PRACTICES ..................... 8

    A. Defendants Deceptively Claim that They Will Provide Mortgage Relief and that They Will Do So Within a Certain Period of Time. ............................. 9

    B. Defendants Lure Consumers by Falsely Claiming that They Are the Government or Are Affiliated with the Government or the Consumers' Lender or Servicer. ........................................... 10

    C. Defendants Falsely Promise Representation by an Attorney. ........................... 13

    D. Defendants Charge Consumers an Illegal Upfront Fee for Their Purported Services. ............................ 15

    E. Defendants Misrepresent that Consumers Will Obtain Mortgage Relief as a Result of a Forensic Audit or Securitization Report. ..................... 16

    F. Defendants Instruct Consumers To Cease Communicating with their Lender. ........................... 17

    G. Defendants Fail To Make Legally Mandated Disclosures to Consumers in Their Marketing Materials and in Telephone Solicitations. ............... 18

    H. Defendants Make Unauthorized Automatic Withdrawals from Consumers' Bank Accounts. ......................... 18

    I. Defendants Fail To Deliver Promised Services and Cause Consumer Harm. ........................................ 19

V.      ARGUMENT ................................................................. 20

i

A. The CFPA Authorizes this Court To Grant the Relief Requested. ....................20

B. Defendants' Violations Warrant a TRO and a Preliminary Injunction..............20

   1.   The Bureau is likely to succeed on the merits. ...........................................21

       a.   Defendants' deceptive representations violate the CFPA...............21

       b.   Defendants unfairly cause consumers' bank accounts to be debited without their prior consent, in violation of the CFPA.........23

       c.   Defendants violate Regulation O. ...................................................24

       d.   Defendants' efforts to avoid the advance fee ban are unavailing. .......................................................................................26

           i.   Defendants cannot circumvent the advance fee ban by purporting to charge consumers only for "forensic audits." ...................................................................................26

           ii.   Defendants' strategy of affiliating with attorneys does not exempt them from Regulation O or the CFPA...............28

   2.   The balance of hardships supports a TRO.....................................................29

   3.   Irreparable injury is likely without an injunction.......................................30

   4.   An injunction is in the public interest...........................................................30

C. Individual Defendants Jalan and Nelsen Are Liable for Their Violations of the CFPA and Regulation O..............................................................................31

D. An *Ex Parte* TRO Freezing Defendants' Assets and Appointing a Temporary Receiver is Necessary To Prevent the Likely Dissipation of Assets and Preserve Funds for Effective Final Relief for Consumers..............32

   1.   This case warrants *ex parte* relief. ..............................................................33

   2.   The Court should freeze Defendants' assets. ...............................................36

   3.   The Court should appoint a temporary receiver....................................37

VI.   CONCLUSION.................................................................................................38

# TABLE OF AUTHORITIES

**Cases**

*CFPB v. Gordon*, No. CV12-06147 (C.D. Cal. Nov. 16, 2012)....................................5, 33

*CFTC v. Forex Liquidity LLC*, No. CV 07-01437, 2009 WL 2231684 (C.D. Cal. July 23, 2009)........................................................................................37

*FTC v. Accusearch Inc.*, No. 6:CV105-D, 2007 WL 4356786 (D. Wyo. Sept. 28, 2007) ..............................................................................................23

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)................................31, 32

*FTC v. Am. Mortg. Consulting Grp.*, No. 8:12-cv-01561 (C.D. Cal. Sept. 18, 2012) .................................................................................5, 34, 38

*FTC v. Consumer Advocates Grp. Experts, LLC*, No. CV12-04736 (C.D. Cal. May 30, 2012) .......................................................................5, 33, 34, 37

*FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) .....................23

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) .........................................22

*FTC v. Data Med. Capital, Inc.*, SACV 99-1266AHS(EEX), 2010 WL 1049977 (C.D. Cal. Jan. 15, 2010) .........................................................................22

*FTC v. EDebitpay, LLC*, No. 07-cv-4880-ODW(AJWx) (C.D. Cal. July 30, 2007) ...........................................................................................33

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)...................................................22

*FTC v. Forensic Case Mgmt. Servs., Inc.*, No. 2:11-cv-07484-RGK-SS (C.D. Cal. Sept. 13, 2011) .................................................................................33

*FTC v. Gill*, 183 F. Supp. 2d 1171 (C.D. Cal. 2001).........................................................22

*FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) .......................24

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982).................................................33

*FTC v. Health Care One LLC*, No. SACV 10-1161 JVS (RNBx) (C.D. Cal. Aug. 3, 2010) ...........................................................................................33

iii

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) .......................................24

*FTC v. Lakhany*, No. CV12-00337 (C.D. Cal. Mar. 5, 2012) .......................................5, 34, 38

*FTC v. Lucas Law Ctr., Inc.*, No. SACV 09-0770 DOC(ANx) (C.D. Cal. July 9, 2009) ................................................................................................................................33

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) .......................................................22

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997)..................................22

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ...............................................................22

*FTC v. Wells*, 385 F. App'x 712 (9th Cir. 2010) ................................................................23

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ...........32, 36

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ................................30, 32

*Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974) .............................................................................................................34

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .......................................................36

*Niu v. United States*, 821 F. Supp. 2d 1164 (C.D. Cal. 2011) ...........................................20

*Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S. Ct. 1086, 90 L. Ed. 1332 (1946)........................................................................................................................33

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ..........................34

*SEC v. Credit First Fund, LP*, No. CV 05-8741DSFPJWX, 2006 WL 4729240 (C.D. Cal. Feb. 13, 2006).......................................................................................30

*SEC v. First Fin. Grp.*, 645 F.2d 429 (5th Cir. 1981)........................................................37

*SEC v. Homestead Props., L.P.*, No. CV09-01331, 2009 WL 5173685 (C.D. Cal. Dec. 18, 2009) ..................................................................................................34

*SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109 (9th Cir. 2006)...........................36, 37

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)......................................37

*SEC v. Presto Telecomms., Inc.*, 153 F. App'x 428 (9th Cir. 2005) ..................................33

*SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV09-2901, 2009 WL 2058247 (C.D. Cal. July 9, 2009)..........................................................................................34

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ............20

*U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091 (9th Cir. 2010) .............................34

*United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) ...................................33

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) ...........30

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed.

    2d 249 (2008) ...............................................................................................................21

**Statutes**

12 U.S.C. § 5481(12)(Q) ......................................................................................................29

12 U.S.C. § 5481(15)(A)(viii)(II) ..........................................................................................4

12 U.S.C. § 5481(19) ............................................................................................................31

12 U.S.C. § 5481(5) ................................................................................................................4

12 U.S.C. § 5481(6) ................................................................................................................4

12 U.S.C. § 5481(6)(A) ........................................................................................................31

12 U.S.C. § 5481(7) ................................................................................................................4

12 U.S.C. § 5491 ....................................................................................................................3

12 U.S.C. § 5517(e) ..............................................................................................................28

12 U.S.C. § 5517(e)(1) .........................................................................................................28

12 U.S.C. § 5517(e)(2) .........................................................................................................28

12 U.S.C. § 5517(e)(3) .........................................................................................................29

12 U.S.C. § 5531 ....................................................................................................................2

12 U.S.C. § 5531(a) ................................................................................................................4

12 U.S.C. § 5531(c)(2) .........................................................................................................23

12 U.S.C. § 5536 ...........................................................................................................2, 3, 20

12 U.S.C. § 5538 .............................................................................................................3, 4, 29

12 U.S.C. § 5564 ....................................................................................................................3

12 U.S.C. § 5564(a) ...................................................................................................3, 4, 20, 33

v

12 U.S.C. § 5564(b) ................................................................. 20

12 U.S.C. § 5565(a)(1) ............................................................ 20

12 U.S.C. § 5565(a)(2) ...................................................... 20, 33

2009 Omnibus Appropriations Act, Pub. L. No. 111-8, Div. D, Title VI, § 626 ............... 3

**Other Authorities**

Mortgage Assistance Relief Services; Final Rule, 75 Fed. Reg. 75,092 (Dec. 1,

    2010) ................................................................. 3, 4, 24, 27

**Rules**

Fed. R. Civ. P. 65(b) ............................................................... 34

Local Rule 7-19.1 ................................................................. 34

Local Rule 7-19.2 ................................................................. 34

**Regulations**

16 C.F.R. § 322.2(i) (2010), recodified as 12 C.F.R. § 1015.2 (2011) ............................ 31

16 C.F.R. § 322.2(j) (2010), recodified as 12 C.F.R. § 1015.2 (2011) ............................ 31

16 C.F.R. § 322.3(a) (2010), recodified as 12 C.F.R. § 1015.3(a) (2011) ...................... 25

16 C.F.R. § 322.3(b) (2010), recodified as 12 C.F.R. § 1015.3(b) (2011) ...................... 25

16 C.F.R. § 322.4(a) (2010), recodified as 12 C.F.R. § 1015.4(a) (2011) ................. 18, 26

16 C.F.R. § 322.4(b) (2010), recodified as 12 C.F.R. § 1015.4(b) (2011) ............ 18, 25, 26

16 C.F.R. § 322.4(c) (2010), recodified as 12 C.F.R. § 1015.4(c) (2011) ................. 18, 25

16 C.F.R. § 322.5(a) (2011), recodified as 12 C.F.R. § 1015.5(a) (2011) ...................... 24

16 C.F.R. § 322.7 (2010), recodified as 12 C.F.R. § 1015.7 (2011) ................................ 28

16 C.F.R. § 322.7(a) (2010), recodified as 12 C.F.R. § 1015.7(a) (2011) ...................... 29

16 C.F.R. § 322.7(b) (2010), recodified as 12 C.F.R. § 1015.7(b) (2011) ...................... 29

16 C.F.R. Part 322 (2010), recodified as 12 C.F.R. Part 1015 (2011) ................................ 2

## I.   INTRODUCTION

The Consumer Financial Protection Bureau ("CFPB" or "Bureau"), the federal agency established by Congress to protect American consumers from financial sector misconduct, asks this Court to halt an ongoing, nationwide mortgage assistance relief scam that preys on distressed homeowners by failing to provide promised relief from unaffordable mortgage payments and foreclosure.  Despite taking illegal advance fees for mortgage assistance relief services, Defendants ultimately provide no meaningful assistance to struggling homeowners.  To the contrary, they exacerbate consumers' problems – often pushing them into foreclosures or short sales – while using the consumers' last dollars to fund their lavish lifestyles.

Since early 2010, Defendants have bilked individual consumers out of thousands of dollars each for mortgage assistance relief services that never materialize.  Najia Jalan ("Jalan") and Richard K. Nelsen ("Nelsen") carry out this scam through the illegal practices of their company National Legal Help Center, Inc. ("NLHC") (collectively "Defendants").  Defendants lure in desperate homeowners via direct mail, direct email, high-volume outbound telemarketing, and 35 live websites.  In these solicitations, Defendants falsely promise to secure substantial relief from unaffordable mortgage payments and threats of foreclosure, in exchange for upfront fees ranging from $1,000 to $3,000, and in some cases more than $10,000.

Furthermore, Defendants gain consumers' trust through false claims that NLHC is a government agency or that it can help consumers qualify for government mortgage-relief programs.  They misappropriate the marks and names of at least five different government agencies and use websites that brazenly copy the government-run makinghomeaffordable.gov website.  Defendants' marketing continually evolves to exploit struggling homeowners looking for relief through the newest government programs.  Most recently, they have falsely claimed that they can help consumers secure benefits under both the Independent Foreclosure Review process administered by the

Office of the Comptroller of the Currency ("OCC") and the recent nationwide mortgage servicing settlement between the government and the five largest mortgage servicers.

In a vain attempt to circumvent federal consumer financial law and take advantage of exemptions for the practice of law, Defendants hold themselves out as a "full-service law firm" and promise legal representation. In reality, however, they are not a law firm, and neither Defendant Jalan nor Defendant Nelsen is an attorney. Moreover, in many, if not all, instances, consumers do not speak to a lawyer and receive no legal representation. Similarly, Defendants attempt to evade the ban on charging consumers upfront fees for mortgage assistance relief services by claiming that their fees are for only an analysis of potential illegal conduct by consumers' lenders – often called a "forensic audit" – and not for the loan modification or foreclosure relief they initially promise. This transparent tactic is also unavailing. Regardless of what Defendants call their "services," they are no different than any other loan modification scam, and their conduct is prohibited by federal consumer financial law.

These and numerous other practices are unfair and deceptive in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536. Defendants also violate numerous provisions of the Mortgage Assistance Relief Services Rule ("Regulation O"), 16 C.F.R. Part 322, recodified as 12 C.F.R. Part 1015, which was promulgated for the purpose of preventing precisely this kind of consumer harm by those providing mortgage relief services.

To immediately stop Defendants' illegal practices and preserve assets necessary for consumer redress, the Bureau asks the Court to issue an *ex parte* temporary restraining order ("TRO") with an asset freeze and appointment of an independent receiver, as well as an order to show cause why a preliminary injunction should not issue. This relief is necessary to prevent continued harm to consumers, dissipation of assets, and destruction of evidence, thereby preserving the Court's ability to provide effective final relief to consumers injured by Defendants' illegal practices.

## II. PLAINTIFF

The Bureau is an independent agency charged by Congress with enforcing the CFPA and other federal consumer financial laws.  12 U.S.C. §§ 5491, 5564.  The Bureau has the authority to bring civil actions against persons violating federal consumer financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law."  12 U.S.C. § 5564(a).  These consumer financial protection laws include Regulation O and the CFPA's prohibition on "any covered person" engaging in "any unfair, deceptive, or abusive act or practice."  12 U.S.C. § 5536.

As the nation's mortgage crisis unfolded and mortgage relief scams became increasingly prevalent, Congress directed the Federal Trade Commission ("FTC") to initiate rulemaking relating to unfair or deceptive acts or practices involving loan modification and foreclosure rescue services.  2009 Omnibus Appropriations Act, Pub. L. No. 111-8, § 626, 123 Stat. 524 (codified, as amended, at 12 U.S.C. § 5538).  Pursuant to that direction, the FTC promulgated the Mortgage Assistance Relief Services Rule, 16 C.F.R. Part 322, which the Bureau since has re-promulgated as Regulation O, 12 C.F.R. Part 1015.  This rule was issued as consumers were facing increasing rates of mortgage delinquencies and foreclosures.  Mortgage Assistance Relief Services; Final Rule, 75 Fed. Reg. 75,092, 75,092-99 (Dec. 1, 2010).  The rule bans advance fees, mandates particular disclosures, and prohibits misrepresentations in marketing these services.  *Id.*

Citing the experience of numerous enforcement agencies, the preamble to the rule laid out a detailed record of unfair and deceptive practices by mortgage assistance relief service providers, including unfulfilled promises of substantial assistance, false claims of affiliation with government or the consumer's lender or servicer, and claims that legal services will be provided when, in fact, little or no legal work is performed for the consumer.  *Id.*  To avoid those seeking mortgage relief assistance being duped into paying for services that never materialize, the FTC included a provision barring mortgage

relief assistance service providers from collecting a fee until they have negotiated a mortgage modification that is acceptable to the customer.  By banning advance fees for mortgage relief assistance services, distressed homeowners should no longer pay for "assistance" that ends up having no real meaning.  *Id.* at 75,108-123.  The FTC also noted that many mortgage assistance relief service providers offer "forensic audits" as a way to skirt state-law bans on advance fees.  *Id*. at 75,096.  As a result, the FTC explicitly confirmed that the definition of mortgage assistance relief services encompasses "'forensic audits' and other services in which the provider purports to review and identify potential errors in loan documents or documents sent by a consumer's lender or servicer in order to avert foreclosure or obtain concessions from the lender or servicer."  *Id.* at 75,100 n.110.  The CFPA transferred rulemaking authority over Regulation O from the FTC to the Bureau, and both agencies now have authority to enforce the regulation.  12 U.S.C. §§ 5538, 5564(a).

In addition to Regulation O, the Bureau has authority under the CFPA to seek relief for "any unfair, deceptive, or abusive act or practice" by "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. §§ 5536(a)(1)(B), 5481(6).  The CFPA expressly indicates that a "consumer financial product or service" includes, among other things, financial advisory services, including "services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure."  12 U.S.C. § 5481(5), (15)(A)(viii)(II).  In relevant part, "credit" means "the right granted by a person to a consumer to . . . purchase property or services and defer payment for such purchase," such as a mortgage.  12 U.S.C. § 5481(7).

This Court recently granted a TRO and preliminary injunction in *Consumer Financial Protection Bureau v. Gordon*, another mortgage assistance relief case brought by the Bureau pursuant to its authority under Regulation O and the CFPA.  No. CV12-06147 (C.D. Cal. Nov. 16, 2012) (Lew, J., Anderson, J.).  Moreover, throughout the

economic crisis, the FTC and other law enforcement agencies have taken actions against similar "foreclosure rescue" and loan modification operations.  For example, the FTC recently filed two cases against entities offering purported forensic audits, in the Central District of California, in which it sought and obtained relief similar to what the Bureau seeks here.  *See FTC v. Consumer Advocates Grp. Experts, LLC*, No. CV12-04736 (C.D. Cal. May 30, 2012) (court granted *ex parte* TRO with asset freeze, appointment of receiver, and immediate access) (Pregerson, J.); *FTC v. Lakhany*, No. CV12-00337 (C.D. Cal. Mar. 5, 2012) (same) (Carney, J.).  Another recent FTC case in this District concerned companies purporting to be law firms, and again the FTC sought and obtained relief similar to what the Bureau seeks here.  *See FTC v. Am. Mortg. Consulting Grp.*, No. 8:12-cv-01561 (C.D. Cal. Sept. 18, 2012) (court granted *ex parte* TRO with asset freeze, appointment of receiver, and immediate access) (Carter, J.).  The Bureau seeks to enforce the CFPA's prohibition on deceptive acts and practices and halt precisely the type of practices and consumer harm that Regulation O was intended to stop.

## III.   DEFENDANTS

Defendants in this action include two individuals, Defendants Jalan and Nelsen, and the corporation they control, NLHC, which was formerly known as iModify Law, Inc. ("iModify Law").  Although iModify Law was only formed in January 2011, Defendants Jalan and Nelsen have been scamming consumers since at least early 2010 under various fictitious business names ("FBNs").

### A.   Najia Jalan

Defendant Jalan, a non-attorney resident of Costa Mesa, California, works under various aliases and FBNs as she carries out her scheme.  Jalan is the President and CEO of NLHC.  California Secretary of State Corporate Registration Documents ("Cal. SOS"), Ex. 1, at 42, 45.  Prior to incorporating iModify Law/NLHC on January 11, 2011, Jalan offered mortgage assistance relief services through the Williams Litigation Center, which she, along with Defendant Nelsen, registered as a FBN on August 20, 2010.  Los Angeles

County Clerk Fictitious Business Name Statements ("LA FBNs"), Ex. 2, at 70.  Jalan has registered numerous other FBNs for herself, including National Legal Help Center, NationalLegalHelp.com, National Legal Assistance, Legal Modification Firm CP, First Class Doc Prep, Williams Law Center JW, and the fictitious business name "Najia Jalan." Orange County Clerk Fictitious Business Name Statements ("OC FBNs") Ex. 3, at 90, 92, 94, 96; LA FBNs, Ex. 2, at 66, 81.

Jalan also uses a number of aliases, including Sarah or Sara St. John, Sarah Johnson, Sarah Kim, Najia Jalah, Sarah Love, Najia Ebrahimi, and Sarah John.  Ventura, Ex. 4 ¶ 6, Attach. A ("Sarah St. John"); Lewis, Ex. 5, Attach. B (Facebook page of "Najia Ebrahimi"); Pritchett, Ex. 6, Attach. V (same Facebook page with name "Sarah Kim"), Attach. EE (name on MySpace.com page is "Najia Jalah (Sara St. John)"), Attach. LL at 422 ("Najia Jalan" changes name on GoDaddy account to "Sarah Kim"), Attach. QQ at 453 ("Najia Jalan" is paying telecommunications bill for customer "Sarah Johnson"); Weber, Ex. 7, Attach. I ("Sarah John"); von Freymann, Ex. 8, Attach. D at 902 (former employee identifies "Najia Jalah" as "Sarah St. John").[1]

Jalan has used her own name and various aliases – most recently, the alias "Sarah Kim" – to register more than 160 internet domain names that relate to mortgage relief or the purported provision of legal services related to mortgage relief.  Pritchett, Ex. 6 ¶ 12, Attach. LL at 413-18.  Jalan's domain name purchases include websites for NLHC and the Williams Litigation Center.  *Id.*, Attachs. Y, LL at 414-18.  In addition to posting websites that purport to offer mortgage assistance relief services, Jalan also has registered domain names designed to assure consumers that NLHC is a legitimate company,

---

[1] Declarations and exhibits cited in this memorandum have been filed concurrently with this motion.  The content of declarations is referred to by the declarant's last name, the exhibit number, and the declaration paragraph number(s), *e.g.*, Ventura, Ex. 4 ¶ 6. Documents attached to declarations are referred to by the declarant's last name, the exhibit number, and the letter of the attachment, *e.g.*, Ventura, Ex. 4, Attach. A.

including "nationallegalhelpcenteristhisascamorfraud.com."  These websites take the form of a blog, ostensibly written by a consumer who had a positive experience with NLHC, urging other consumers to beware of scams and hire NLHC.  *Id.*, Attach. FF. Using the alias "Sarah Johnson," but paying with a credit card issued in her own name, Jalan contracts for telephone numbers and telemarketing software used to perpetrate Defendants' scheme.  *Id.*, Attach. QQ at 453.  Also using the alias "Sarah Johnson," Jalan has listed herself as an attorney on the website RocketLawyer.com.  Lewis, Ex. 5, Attach. A.  Jalan has opened or is an authorized signatory for nearly all of Defendants' bank accounts, as well as bank accounts in the name of Williams Litigation Center.  Dobkin, Ex. 9 ¶ 3.

### B.    National Legal Help Center, Inc.

NLHC is a California corporation of which Jalan is President and CEO and Nelsen is Secretary and CFO.  It was incorporated on January 11, 2011, as iModify Law, Inc., and renamed National Legal Help Center, Inc., on August 29, 2011.  Cal. SOS, Ex. 1, at 41, 42.  NLHC has a number of FBNs, including National Legal Help Center EP, NationalLegalHelp.com, National Legal Help Center, National Consumers Bank & Trust, First Class Doc Prep / NCHC, and National Legal Help Center, HB.  OC FBNs, Ex. 3, at 86, 88, 92, 98, 102, 104.

The registered business address for NLHC is 1740 East Garry Avenue, Suite 206, Santa Ana, California, and the FBNs National Consumers Bank & Trust, First Class Doc Prep / NCHC, First Class Doc Prep, NationalLegalHelp.com, and National Legal Assistance, are also registered at that address.  Cal. SOS, Ex. 1, at 45; OC FBNs, Ex. 3, at 90, 102.  The company also appears to be using Suites 118, 119, and 202 of the East Garry Avenue building.  Polite, Ex. 10 ¶ 4; OC FBNs, Ex. 3, at 90.  NLHC's FBNs are registered at several additional addresses:  National Legal Help Center EP is registered at 3842 South Bristol Street Suite 102, Santa Ana, California 92704; and National Legal Help Center HB is registered at 17632 Metzler Lane, Suite 201, 211, Huntington Beach,

California 92647.  OC FBNs, Ex. 3, at 98, 106.  In documents provided to consumers, NLHC also lists Los Angeles addresses at 5482 Wilshire Boulevard, Suite 1513, and 5455 Wilshire Boulevard, Suite 2122.  Van Dyke, Ex. 11, Attachs. F at 1032, G at 1045.

Defendants have been the subject of more than 100 consumer complaints, from consumers in 26 states.  Pritchett, Ex. 6 ¶ 8.  These complaints have been made to the FTC, the Southland Better Business Bureau, and the State Bar of California.  *Id.*; Burge, Ex. 12 ¶ 10; von Freymann, Ex. 8 ¶ 4; Ventura, Ex. 4 ¶ 3.  Due to the volume and the serious nature of the complaints, the BBB currently gives NLHC an "F" rating.  Burge, Ex. 12 ¶ 12.

### C.    Richard K. Nelsen

Defendant Nelsen, a non-attorney resident of Costa Mesa, California, has worked alongside Jalan to operate this unlawful mortgage assistance relief services scheme. Nelsen usually goes by "Rick" and sometimes spells his last name as "Nelson."  Pritchett, Ex. 6, Attach. LL at 426.  He is the Secretary and CFO of NLHC.  Cal. SOS, Ex. 1, at 42, 45.  Both individually and with Jalan, Nelsen has registered FBNs to market mortgage assistance relief services, including National Consumers Help Center, First Class Doc Prep, and NationalLegalHelp.com.  LA FBNs, Ex. 2, at 54; OC FBNs, Ex. 3, at 90, 92, 100.  Nelsen is also an authorized signatory for many of Defendants' bank accounts, as well as the Williams Litigation Center accounts.  Dobkin, Ex. 9 ¶ 3.  Nelsen is listed as the billing contact for many of the domain name registrations for NLHC's numerous websites.  Pritchett, Ex. 6, Attach. LL at 421.  Separately, Nelsen has registered the domain name firstclassdocuments.com, which corresponds to First Class Dec Prep, one of Defendants' FBNs.  *Id.* at 424.

## IV.    DEFENDANTS' BUSINESS PRACTICES

Since beginning their operations in early 2010, Defendants have engaged in an array of deceptive, unfair, and unlawful business practices that have cost consumers thousands of dollars and, in some cases, their homes.

**A.**     **Defendants Deceptively Claim that They Will Provide Mortgage Relief and that They Will Do So Within a Certain Period of Time.**

Defendants entice consumers through false promises that they generally will or likely will obtain mortgage loan modifications for consumers that will make their payments substantially more affordable or will help them avoid foreclosure.  Boatwright, Ex. 13 ¶ 4 (Defendants would obtain rates "as low as 2% or 31% of your gross income"); Weber, Ex. 7 ¶ 3 (same); Folsom, Ex. 14 ¶ 3 (Defendants would obtain rate of 3%, possibly with a principal reduction to 80% of market value); Blanks, Ex. 15 ¶ 3 (Defendants would obtain rate of 3%); Davis, Ex. 16 ¶ 5 (Defendants would stop foreclosure).  They also promise that they will achieve these results within a certain period of time, usually 90-120 days.  Aleman, Ex. 17 ¶ 5 (Defendants would prevent foreclosure within two months); Collins, Ex. 18 ¶ 9 (Defendants would obtain loan modification within 90 days); Folsom, Ex. 14 ¶ 3 (NLHC employee said modification would take 90-120 days).  Defendants' telemarketing training manual instructs employees to make these representations.  Van Dyke, Ex. 11, Attach. C at 1001 ("Let [consumers] know that they could possibly be paying (31% of [their] net income) in as little as 120 days.").

Defendants' marketing, including direct mailers, spam emails, and websites, promises that consumers will receive foreclosure relief or mortgage loan modifications that make consumers' mortgage payments substantially more affordable.  For example, one mailer, on a page with the Making Home Affordable logo at the top, congratulates consumers on having been "approved to enter into a trial period plan under the Home Mortgage Re-Structure Program" and tells them to expect "a New Principle [sic] Balance" and a "New Rate."  Wade, Ex. 19, Attach. A at 1460; *id.* ("If you have a Sale Date contact us in a timely manner and *your Lender will not conduct a foreclosure sale*.") (emphasis in original); Davis, Ex. 16, Attach. J at 1349 (spam email stating "HAMP

9

REDUCTION PROGRAM TERMS WHEN YOUR [sic] APPROVED:  New Rates start at 1.99% with FixTerms [sic] . . . Principle [sic] & Equity Reduction of Mortgage Loan); Pritchett, Ex. 6, Attach. G (hud-guidelines.com states that a "home loan re-structure can benefit ones [sic] mortgage" by "[r]educ[ing] loan interest rate"), Attach. M (securitizationlitigation.com promises to "place a HOLD on all Foreclosure Proceedings").

Defendants do not obtain for consumers foreclosure relief or mortgage loan modifications that make consumers' payments substantially more affordable.  *See, e.g.*, Boatwright, Ex. 13 ¶¶ 39-40; Davis, Ex. 16 ¶ 20; Folsom, Ex. 14 ¶ 30; Swinton, Ex. 20 ¶ 15; Weber, Ex. 7 ¶ 27.  Indeed, consumers do not receive any meaningful mortgage assistance relief services from Defendants.  *Id.*

**B.    Defendants Lure Consumers by Falsely Claiming that They Are the Government or Are Affiliated with the Government or Consumers' Lenders or Servicers.**

Defendants' marketing materials feature government seals, logos, and language likely to generate a false impression that Defendants are affiliated with the government. *See, e.g.*, Pritchett, Ex. 6, Attach. KK at 404 (consumer "belie[ved] that it was a government 'Making Home Affordable' program" because it was "completely set up as such").

Defendants' direct mail solicitations contain the seals and marks of numerous government agencies, including the United States Department of the Treasury ("Treasury"), the Securities and Exchange Commission ("SEC"), and the OCC.  Wade, Ex. 19, Attach. A at 1459-61.  One direct mailer falsely states that it is being sent "at the direction of federal bank regulators" and instructs recipients to contact 855-LAW-5559 because their "loan may be eligible for an Independent Foreclosure Review that may result in compensation or other remedy":



To contact a housing counselor, call:
**855LAW 5559**
Homeowner's HELP Hotline

Office *of the* Comptroller *of the* Currency
*Ensuring a Safe and Sound National Banking System for all Americans.*

**Independent Foreclosure Review For Fraud**

NationalLegalHelp.com

**Important Notice:**

Your loan may be eligible for an Independent Foreclosure Review that may result in compensation or other remedy. Please respond by 12/31/12.

**Foreclosure Grant Review: 855 529 5559**

If you have more than one mortgage account that meets the initial criteria for an independent review, you will receive a separate notice for each. You will need to submit a separate Request for Review for each account.

To Find Out More Information about Asset Backed Securities Please Visit SEC.GOV

*Id.* at 1461.

This statement is an apparent attempt to mimic the OCC's Independent Foreclosure Review process, a government program through which mortgage borrowers can request free third-party review of their cases. In response, on March 16, 2012, the OCC issued an alert on its website, stating that "a group using the names '855LAW5559' and 'National Legal Help' has misrepresented that the OCC has directed their organization to send foreclosure grant review correspondence to banking consumers. . . . [T]he program does not appear to be legitimate and instead is likely an 'up-front-fee scam.'" Pritchett, Ex. 6, Attach. GG.

In addition to direct mail, Defendants send spam emails from the sender "Independent Foreclosure Review." Davis, Ex. 16, Attach. J at 1347; Boatwright, Ex. 13, Attach. GG. Defendants' other spam emails also appear to come from a sender affiliated with or approved by government agencies, such as "U.S[.] Dep of Housing New Programs" and "United States Department of Mortgage Fraud and Consumer Protection." Boatwright, Ex. 13, Attach. C; Pritchett, Ex. 6, Attach. KK at 406; *see also* Boatwright,

Ex. 13, Attach. E (sender is "National Homeowners Assistance Program Approved by the FTC 855-LAW-5559").

In yet another recent variation, Defendants have begun sending spam emails that purport to be from the California Attorney General's "public fraud protection unit" and claim they can help consumers obtain benefits under the recent national mortgage settlement between state attorneys general, the federal government, and the five largest mortgage servicers in the United States.  Salazar, Ex. 21, Attach. B.

Defendants' spam and mailers direct consumers to Defendants' websites, which further perpetuate the ruse.  Defendants have registered more than 160 domain names that relate to mortgage assistance relief services.  Most notably, Defendants' makinghomeaffordable.ca is a near-exact replica of makinghomeaffordable.gov, the official government webpage for the MHA program.  Pritchett, Ex. 6, Attachs. T, U.  Indeed, the only visible difference between the two websites is the phone number.  *Id.*  A cease-and-desist letter dated July 27, 2012, from Treasury's Office of Financial Stability instructed Defendants to discontinue all use of makinghomeaffordable.ca and transfer the domain name to Treasury.  Wade, Ex. 19 ¶ 11.  After receiving this letter, Defendants briefly took down makinghomeaffordable.ca, *id.* ¶ 12, but they recently relaunched the site with new content.  Pritchett, Ex. 6, Attach. II.  Defendants also continue to operate websites, such as nationalbankfraud.com and nationalconsumersassistancecenter.com, that substantially mimic makinghomeaffordable.gov.  *Id.*, Attachs. Z, BB; Wade, Ex. 19 ¶ 13.

Defendants' marketing materials also contain statements likely to mislead consumers that Defendants are affiliated with consumers' mortgage lenders or servicers.  For example, one direct mailer contains a page entitled "Notice of Trustee's Sale . . . please call 855-529-5559 to stop the sale."  Van Dyke, Ex. 11, Attach. D.  This mailer is an apparent attempt to trick consumers into believing that they are receiving a notice of sale from their servicers; when they call the number listed to inquire further, they get

NLHC.  *See also* Pritchett, Ex. 6, Attach. KK at 408 (email reading, "You[r] Mortgage Lender Bank of AmericaCountryWide [sic] and Office of the CEO and President is writing in response to your correspondence").  Moreover, certain websites include the logos of numerous lenders or servicers to suggest that Defendants are affiliated with those companies.  Pritchett, Ex. 6, Attachs. X, CC.

### C.    Defendants Falsely Promise Representation by an Attorney.

Defendants falsely state that NLHC is a law firm and that an attorney has reviewed consumers' files and will represent them.  But NLHC is not a law firm and consumers generally do not receive representation from – or even communicate with — the attorneys affiliated with Defendants.

Defendants lure in distressed consumers with a direct mailer stating that "[a] Civil Complaint will be filed against your Lender for Misrepresentation and Fraud" and websites stating that Defendants have "helped many homeowners restructure their home loan through utilizing the law and the power of litigation."  Wade, Ex. 19, Attach. A at 1466; Pritchett, Ex. 6, Attach. J; *id.*, Attach. C (foreclosure-prevention-law.com states, "We are a Full Services Law Firm with over 33 Years of Experience"), Attach. E.  Then, when consumers call NLHC, Defendants' employees compound Defendants' initial misrepresentations by telling consumers that NLHC is a "full service" law firm with "attorneys nationwide."  Van Dyke, Ex. 11, Attach. C at 986, 1013.  They falsely state that NLHC's attorneys will "fight[] the bank to lower [consumers' mortgage] payments" and that negotiating with the consumer's bank is a "special service for you done by our attorneys . . . [h]aving an attorney that can maximize your potential of being successful in obtaining a long term loan modification is worth way more than the price we charge."  *Id.* at 1008, 1015-16.  When one consumer expressed concerns about NLHC's reputability, he was reassured that he should trust NLHC because it was a member of the law networks nolo.com and lawfirms.com, which have rigorous standards.  Morgan, Ex. 22 ¶ 7, Attach. B.

The contract package Defendants send to consumers further perpetuates the myth that consumers will receive legal representation.  Defendants' contract includes an "Attorney Retainer Agreement" and tells consumers that NLHC will "designate which attorney will be assigned to your case, prepare papers, negotiate settlements, appear in court, conduct the trial or perform any other work on client's case."  Boatwright, Ex. 13, Attach. H at 1130.  Additionally, certain of Defendants' contracts charge consumers for purported services rendered in phases, with litigation by an attorney as the final phase. *Id.* at 1131.  Other contract iterations state that the final phase includes a "complaint filed."  Davis, Ex. 16, Attach. C at 1320.  Once a consumer is in the "litigation phase," Defendants charge an additional monthly fee.  Folsom, Ex. 14 ¶¶ 6, 18, Attach. C; Swinton, Ex. 20, Attach. A at 1488.  For at least one consumer, this monthly fee spiked to $2,000 per month.  Weber, Ex. 7 ¶¶ 4, 24, 26, Attach. C at 788, Attach. L.

Moreover, as part of this scheme, Defendant Jalan falsely represents to consumers that she is, herself, an attorney.  Blanks, Ex. 15 ¶ 4; Davis, Ex. 16 ¶ 6; Weber, Ex. 7 ¶ 7. Jalan created a profile for herself, as "Sarah Johnson," on the online lawyer directory RocketLawyer.com.  Lewis, Ex. 5, Attach. A.  The RocketLawyer profile describes "Johnson" as a graduate of Temple Law School who started working at NLHC in 2006. But no one named "Sarah Johnson" has graduated from Temple Law School in or since 2006, Bennett-Yates, Ex. 23 ¶ 4, the first year that someone born in 1984, as Jalan was, realistically could have graduated from law school.  Additionally, the State Bar of California has received complaints regarding a Sarah Johnson engaging in the unauthorized practice of law at 1740 East Garry Ave., Santa Ana, California – NLHC's address.  von Freymann, Ex. 8 ¶ 15; Cal. SOS, Ex. 1, at 45.

In reality, Defendants are not lawyers or a law firm, and consumers receive neither advice from nor representation by an attorney.  Aleman, Ex. 17 ¶ 17; Blanks, Ex. 15 ¶ 3; Collins, Ex. 18 ¶ 21; Davis, Ex. 16 ¶ 6; Folsom, Ex. 14 ¶ 27; Morgan, Ex. 22 ¶ 25; Swinton, Ex. 20 ¶¶ 5-6; Weber, Ex. 7 ¶ 27.  Instead, Defendants merely affiliate with

attorneys, at least one of whom has been suspended from the practice of law for her purported loan modification work.  Pritchett, Ex. 6 ¶ 4, Attachs. HH, JJ at 382; Van Dyke, Ex. 11, Attach. E.  Defendants include these attorneys' information in their marketing materials to consumers, even though these attorneys are not licensed to practice law in the consumers' states and do not segregate client funds into the required client trust accounts.  Pritchett, Ex. 6 ¶ 37, Attach. SS at 612-33.  Defendant Nelsen even admitted to one consumer that NLHC does not use these attorneys to negotiate with the banks on consumers' behalf.  Folsom, Ex. 14 ¶ 27.  In a few instances, Defendants send consumers a stock, reused draft complaint or *lis pendens* and tell consumers to file it themselves on a *pro se* basis without providing legal advice about these documents.  *Id.*

### D.  Defendants Charge Consumers an Illegal Upfront Fee for Their Purported Services.

Defendants promise foreclosure relief or mortgage loan modifications that make consumers' payments substantially more affordable in exchange for an advance fee, usually $1,000 - $3,000.  Collins, Ex. 18 ¶ 8 ($3,000); Folsom, Ex. 14 ¶ 30 ($3,000); Swinton, Ex. 20 ¶ 15 ($2,500); Van Dyke, Ex. 11, Attach. C at 1022 ("We can secure your modification case terms and conditions for as low as $995.").  Some consumers, however, paid Defendants much more.  Weber, Ex. 7 ¶ 26 ($15,495); Blanks, Ex. 15 ¶ 24 (close to $10,000); Boatwright, Ex. 13 ¶ 45 ($6,000); Davis, Ex. 16 ¶ 10 ($4,500).

Defendants tell consumers that they must pay the upfront fee before Defendants will work on the consumer's file.  Swinton, Ex. 20 ¶ 8.  Some fees are characterized as an "application fee" – by definition an advance fee for work not yet performed.  Weber, Ex. 7 ¶¶ 4-5, Attach. C at 788 ($3,495 application fee).  Defendants also commonly tell consumers that they must continue to pay or else Defendants will abandon their files.  Collins, Ex. 18 ¶¶ 17-19; Folsom, Ex. 14 ¶ 22 (NLHC would not file TRO or serve complaint until consumer paid additional $2,000).

### E.   Defendants Misrepresent that Consumers Will Obtain Mortgage Relief as a Result of a Forensic Audit or Securitization Report.

Defendants tell consumers that consumers will obtain mortgage relief as a result of Defendants' analysis of their mortgage loans – a service Defendants variously call a "forensic audit" or "securitization report."  Van Dyke, Ex. 11, Attach. C at 987-88; *see also* Collins, Ex. 18 ¶ 19; Davis, Ex. 16 ¶ 9; Weber, Ex. 7 ¶ 22.  Defendants misrepresent that (1) they will provide the homeowner with a detailed analysis of illegal conduct engaged in by their lender, which Defendants will use as leverage when negotiating a loan modification or foreclosure prevention; and (2) NLHC's fees are for the forensic audit but not for the loan modification services.  Van Dyke, Ex. 11, Attach. C at 988, 1015-16; Collins, Ex. 18, Attach. F.

After promising to obtain foreclosure relief or loan modifications for consumers in exchange for an upfront fee, Defendants charge some homeowners for a "forensic audit" or "securitization report."  Defendants instruct their employees to tell consumers, "The audit is basically an extensive and thorough examination of your loan documents that you signed when you got your mortgage loan.  [Our] legal experts examine your loan documents for violations of state and Federal laws. . . . [T]hese violations are the LEVERAGE used to argue your case against your lender."  Van Dyke, Ex. 11, Attach. C at 988.  Consumers frequently do not receive the promised analysis in any form.  Collins, Ex. 18 ¶ 21; Swinton, Ex. 20 ¶ 9.  Even those consumers who receive a document purporting to analyze their mortgage commonly do not get the mortgage relief they are seeking and which Defendants promised the purported analysis would yield.  Boatwright, Ex. 13 ¶¶ 23, 40; Folsom, Ex. 14 ¶ 30.

Defendants also disingenuously structure their services into separate "phases" and claim to charge a fee only for the forensic audit phase, apparently so they can assert that they provide the promised loan modification for "free" and not in exchange for an

16

advance fee.  Aleman, Ex. 17, Attach. B at 1392; Ventura, Ex. 4, Attachs. C at 126, D at 167; von Freymann, Ex. 8, Attachs. B at 860, C at 885.  As discussed *infra* section V.B.1.d.i, it appears that this is an attempt to circumvent state law and Regulation O's ban on advance fees when, in reality, Regulation O explicitly applies to so-called "forensic audits."  This tactic has been tried by defendants in other cases brought by the Bureau and the FTC, and courts have repeatedly rejected it as a failed attempt to circumvent the law's advance fee ban.  *See supra* Part II.

## F.   Defendants Instruct Consumers To Cease Communicating with Their Lenders.

Defendants explicitly instruct consumers not to contact or communicate with their mortgage companies, even after the consumers have received foreclosure notices.  Instead, Defendants assert that they will handle all negotiations and other communications with consumers' lenders.  Van Dyke, Ex. 11, Attach. C at 1002 ("[The bank] will start calling you to give you offers and we HIGHLY recommend that you NEVER GIVE IN.");  Collins, Ex. 18 ¶ 23; Weber, Ex. 7 ¶ 16.  In some instances, Defendants even chide consumers who, in desperation, reach out to their lenders for information.  Blanks, Ex. 15 ¶ 14.

Because consumers follow Defendants' instructions to ignore communications from their lenders, foreclosure notices go unanswered and consumers miss the chance to receive real mortgage relief assistance through, for example, a foreclosure mediation program or HUD-certified non-profit housing counselor.  One victim declined to apply for mediation with her lender because she believed that she was already in the loss-mitigation process with NLHC.  Boatwright, Ex. 13 ¶ 35.  Another consumer decided not to file foreclosure postponement papers before the sheriff's sale on his property because an NLHC employee told him, "I don't think you need to do that[;] that is what you pay us for."  Davis, Ex. 16 ¶¶ 17-19, Attach. G.

### G. Defendants Fail To Make Legally Mandated Disclosures to Consumers in Their Marketing Materials and in Telephone Solicitations.

Defendants fail to make nearly all of the disclosures mandated by Regulation O in their mail solicitations, on their websites, and during telephone calls with consumers. Specifically, Defendants' solicitations fail to disclose in a clear and prominent manner that:  (1) Defendants are not associated with the government or approved by the government or the consumer's lender; (2) the consumer can stop doing business with Defendants and reject any offer obtained by Defendants; and (3) even if the consumer uses Defendant's service, the consumer's lender may not agree to modify the loan.  16 C.F.R. § 322.4(a)-(b) (2010), recodified as 12 C.F.R. § 1015.4(a)-(b) (2011).  Even though one version of their website contains a fine-print disclaimer of government affiliation, the vast majority of Defendants' marketing materials do not include any of the required disclosures.  Aleman, Ex. 17 ¶¶ 9-11; Blanks, Ex. 15 ¶¶ 6-8; Boatwright, Ex. 13 ¶¶ 7, 13, 14; Collins, Ex. 18 ¶¶ 7, 11, 12; Davis, Ex. 16 ¶¶ 11-13; Folsom, Ex. 14 ¶¶ 9-11; Morgan, Ex. 22 ¶ 9; Weber, Ex.7 ¶¶ 10, 11; *compare* Pritchett, Ex. 6, Attach. K.

Defendants also tell consumers to stop paying their mortgages yet fail to make the disclosure required under 16 C.F.R. § 322.4(c) (2010), recodified as 12 C.F.R. § 1015.4(c) (2011), that "[i]f you stop paying your mortgage, you could lose your home and damage your credit rating."  Blanks, Ex. 15 ¶¶ 3, 8; Boatwright, Ex. 13 ¶¶ 15-16; Collins, Ex. 18 ¶ 24; Weber, Ex. 7 ¶¶ 8, 12.

### H. Defendants Make Unauthorized Automatic Withdrawals from Consumers' Bank Accounts.

After depositing consumers' checks, Defendants sometimes cause consumers' bank accounts to be debited without having previously obtained consumers' express informed consent.  Defendants generally cause these unauthorized debits by entering the account and routing numbers on consumers' paper checks into electronic check-writing

software and issuing themselves an unauthorized check.  *See* Pritchett, Ex. 6, Attach. RR at 519, 525, 562, 566 (electronic check images).  While Defendants sometimes ask consumers for authorization to make automatic debits, Folsom, Ex. 14 ¶ 16, they make withdrawals even in the absence of authorization.  Boatwright, Ex. 13 ¶¶ 30-31 (reporting three unauthorized electronic checks), Attachs. T-W.  One consumer spent months disputing the repeated unauthorized debits with NLHC and her bank.  *Id.* ¶ 30.

## I.   Defendants Fail To Deliver Promised Services and Cause Consumer Harm.

Despite their promises and despite taking consumers' payments, Defendants do not obtain the promised foreclosure relief or mortgage loan modifications that make consumers' payments substantially more affordable.  Boatwright, Ex. 13 ¶¶ 39-40; Davis, Ex. 16 ¶ 20; Folsom, Ex. 14 ¶ 30; Swinton, Ex. 20 ¶ 15; Weber, Ex. 7 ¶ 27.  Instead of helping consumers, Defendants' actions cause them life-altering harm, including the loss of their homes.  Blanks, Ex. 15 ¶ 24 ("I was not in foreclosure until your company told me to stop paying the mortgage.  Then after it went into foreclosure your company has been charging me money to stop the foreclosure and postpone it."); Boatwright, Ex. 13 ¶¶ 15, 40 (consumer was current on her mortgage payments until NLHC told her to stop paying her mortgage in full; now living in foreclosed home); Davis, Ex. 16 ¶ 20 (consumer living in foreclosed home); Aleman, Ex. 17 ¶ 16 (same); Collins, Ex. 18 ¶¶ 25-26 (lost home due to short sale).  All told, Defendants have taken in at least $1.6 million, Dobkin, Ex. 9 ¶ 5, from hundreds of struggling homeowners.

**V.    ARGUMENT**

The Bureau seeks a permanent injunction and other equitable relief to protect consumers from future harm and redress the injury caused by Defendants' violations of the CFPA and Regulation O.  To preserve the possibility of effective final relief and prevent Defendants from committing further violations during the pendency of this action, the Court should grant the Bureau's application for an *ex parte* TRO, including an asset freeze, appointment of a temporary receiver, and immediate access to Defendants' business premises.

### A. The CFPA Authorizes this Court To Grant the Relief Requested.

The CFPA vests the Bureau with the authority to prevent violations of federal consumer financial law by commencing a civil action seeking all appropriate legal and equitable relief, including a permanent or temporary injunction.  12 U.S.C. § 5564(a), (b).  Such violations include violations of the CFPA itself and of regulations that the Bureau is charged with enforcing, including Regulation O.  12 U.S.C. § 5536.  The CFPA authorizes this Court to order any appropriate equitable relief, including the rescission of contracts, restitution, and disgorgement or compensation for unjust enrichment.  12 U.S.C. § 5565(a)(1), (2).

### B. Defendants' Violations Warrant a TRO and a Preliminary Injunction.

The Bureau seeks a TRO and an order to show cause why a preliminary injunction should not issue based on Defendants' violations of the CFPA and Regulation O.  The standard for issuing a TRO is the same as for a preliminary injunction.  *Niu v. United States*, 821 F. Supp. 2d 1164, 1167 (C.D. Cal. 2011); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  To obtain a preliminary injunction, a plaintiff must establish four factors:  "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d

20

249 (2008).  The Ninth Circuit uses a "sliding scale" approach to assess the elements required for a preliminary injunction, so that a stronger showing of one element may offset a weaker showing of another, provided that all factors are present.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).  In particular, a preliminary injunction may issue if there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

In this case, the Bureau readily meets each of the four prongs and presents ample evidence to justify the entry of a TRO and preliminary injunction.

## 1.  The Bureau is likely to succeed on the merits.

The Bureau is likely to prevail on the merits of this action.  As set forth in more detail below, the Bureau has shown that Defendants (1) employ a series of deceptive representations to dupe consumers into paying their last dollars for mortgage assistance relief services that never materialize, in violation of the CFPA; (2) unfairly cause consumers' bank accounts to be debited without previously having obtained consumers' express informed consent, also in violation of the CFPA; and (3) engage in the very unlawful practices prohibited by Regulation O – collecting advance fees, telling consumers not to contact their lenders or servicers, making deceptive representations, and failing to provide mandated disclosures.  Finally, Defendants are not exempt from Regulation O's prohibition on advance fees.

### a.  Defendants' deceptive representations violate the CFPA.

The CFPA prohibits "any covered person" from engaging in "any unfair, deceptive, or abusive act or practice."  12 U.S.C. §§ 5531(a), 5536(a)(1)(B).  As discussed further below, Defendants' activities constitute "deceptive" acts or practices under Sections 1031 and 1036 of the CFPA.

In cases construing the standard for deception under the Federal Trade Commission Act ("FTC Act"), which are instructive in construing the CFPA's deception standard, it is well-settled that an act or practice is deceptive if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances. *See FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995). The FTC need not prove reliance by each consumer misled by Defendants. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993); *FTC v. Gill*, 183 F. Supp. 2d 1171, 1185 (C.D. Cal. 2001). A representation or omission is material if it is likely to affect a consumer's decision. *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). Express claims, or deliberately made implied claims, that are used to induce a consumer's action are presumed to be material. *Pantron I*, 33 F.3d at 1095-96. Moreover, consumer reliance on express claims is presumptively reasonable. *FTC v. Data Med. Capital, Inc.*, SACV 99-1266AHS(EEX), 2010 WL 1049977, at *27 (C.D. Cal. Jan. 15, 2010) (citations omitted). Finally, it is not necessary to prove that Defendants' misrepresentations were made with intent to defraud or deceive. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

As detailed in Part IV.A, B, C, and E, *supra*, Defendants misrepresent that: (1) they will provide consumers with mortgage relief and will do so within a certain period of time; (2) they are affiliated with the United States government or the consumer's lender or servicer; (3) they will provide consumers with legal representation; and (4) consumers will obtain mortgage relief as a result of a forensic audit provided by Defendants. These representations are presumed to be material because Defendants make them expressly. Moreover, they are likely to mislead – and in fact have misled – consumers acting reasonably in light of the circumstances.

Accordingly, the Bureau has shown a likelihood of success on its claim that Defendants are engaging in deceptive practices in violation of the CFPA.

**b. Defendants unfairly cause consumers' bank accounts to be debited without their prior consent, in violation of the CFPA.**

The Bureau has also shown that Defendants are inflicting substantial and unavoidable injury to consumers by causing debits to consumers' bank accounts without having obtained consumers' express prior informed consent. This conduct is unfair, in violation of the CFPA. 12 U.S.C. § 5536(a)(1)(B).

An act or practice is unfair if: (1) it causes or is likely to cause substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(2). In applying this standard under the FTC Act, numerous courts have held that debiting consumers' bank accounts without authorization constitutes an unfair practice. *See, e.g.*, *FTC v. Wells*, 385 F. App'x 712, 713 (9th Cir. 2010); *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001); *FTC v. Accusearch Inc.*, No. 6:CV105-D, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007) (finding substantial injury based on the time and resources consumers spent contesting the checks at their banks, protecting their accounts, and attempting to get their money back).

First, consumers incur substantial injury in the form of unauthorized, unanticipated, and later-disputed debits in the range of $500-$1,000 from their bank accounts. *See supra* Part IV.H. Consumers spend time and effort disputing these charges with their banks and with Defendants. Boatwright, Ex. 13 ¶¶ 30-31. These unavoidable debits tend to take place at the beginning of the month, when consumers may have earmarked these funds for other expenses that may come due. *Id.*, Attachs. T-W. Accordingly, these debits could cause consumers' accounts to become overdrawn.

Second, consumers cannot reasonably avoid the injury because Defendants – without consumers' knowledge or authorization – appear to be inputting the routing and account numbers from consumers' paper checks into electronic check-writing software to

23

cause the debits.  *See supra* Part IV.H.  By paying themselves from consumers' bank accounts on an ongoing basis, Defendants deprive consumers of a free and fair choice of whether to continue to pay for their purported services.  *See FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

Third, consumers receive no enhancement in service or other benefit that might outweigh the harm inflicted by Defendants' unauthorized debits.  There are no countervailing benefits for a court to consider where consumers never receive the contracted-for service in the first place.  *FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1289 (M.D. Fla. 2008).  Here, not only did Defendants' victims not receive any enhancement in service by virtue of the unauthorized debits, they did not receive even the baseline services they expected.

Accordingly, the Bureau is likely to prevail in proving that Defendants are engaged in unfair practices in violation of the CFPA.

### c.  Defendants violate Regulation O.

The Bureau is also likely to prevail on the merits with respect to Defendants' violation of Regulation O.  The evidence shows that Defendants plainly violate at least four key provisions of Regulation O, which federal government regulators promulgated specifically to protect consumers from mortgage relief scammers like Defendants.  75 Fed. Reg. at 75,097-98.  Defendants (1) collect prohibited advance fees; (2) represent that consumers should not contact their lenders or servicers; (3) make prohibited representations; and (4) fail to make mandatory disclosures.

First, Regulation O prohibits mortgage assistance relief service providers from collecting any fees until the provider has secured an offer of mortgage relief from the consumer's lender and the consumer has signed an agreement accepting this offer.  16 C.F.R. § 322.5(a) (2011), recodified as 12 C.F.R. § 1015.5(a) (2011).  In other words, it is unlawful for a mortgage assistance relief service provider to collect money from

consumers until the promised relief has been obtained.  As explained *supra* Part IV.D,
Defendants routinely collect advance fees from consumers in violation of the rule.

Second, Regulation O bars mortgage assistance relief service providers from
instructing consumers not to contact their mortgage lenders or servicers.  16 C.F.R.
§ 322.3(a) (2010), recodified as 12 C.F.R. § 1015.3(a) (2011).  Defendants routinely do
so.  *See supra* Part IV.F.  Third, Regulation O mandates that companies may not
misrepresent (a) the likelihood of their negotiating, obtaining, or arranging mortgage loan
modifications that make consumers' payments substantially more affordable, 16 C.F.R.
§ 322.3(b)(1) (2010), recodified as 12 C.F.R. § 1015.3(b)(1) (2011); (b) the likelihood of
their doing so within a certain period of time, 16 C.F.R. § 322.3(b)(2) (2010), recodified
as 12 C.F.R. § 1015.3(b)(2) (2011); (c) their affiliation with or approval by federal or
state governments, a governmental homeowner assistance plan, or a nonprofit housing
agency or program, 16 C.F.R. § 322.3(b)(3)(i)-(iv) (2010), recodified as 12 C.F.R.
§ 1015.3(b)(3)(i)-(iv) (2011); (d) their affiliation with or approval by consumers'
servicers or lenders, 16 C.F.R. § 322.3(b)(3)(v) (2010), recodified as 12 C.F.R.
§ 1015.3(b)(3)(v) (2011); or (e) their provision of legal representation for consumers.  16
C.F.R. § 322.3(b)(8) (2010), recodified as 12 C.F.R. § 1015.3(b)(8) (2011).  These
misrepresentations are the crux of Defendants' business.  *See supra* Part IV.A, B, C.

Fourth, Regulation O requires mortgage relief servicers to make the following
disclosures in a clear and prominent manner in either general communications, such as
websites, or consumer-specific communications, such as direct mail solicitations:  (a) that
Defendants' company is neither associated with the government nor approved by the
government or consumer's lender; (b) even if the consumer uses Defendants' service, the
consumer's lender may not agree to modify the loan; and (c) if Defendants tell a
consumer to stop paying his or her mortgage, that the consumer could lose his or her
home and damage his or her credit rating.  16 C.F.R. § 322.4(a)(1)-(2), (b)(2)-(3), (c)
(2010), recodified as 12 C.F.R. § 1015.4(a)(1)-(2), (b)(2)-(3), (c) (2011).  In addition, for

consumer-specific communications, Defendants must also disclose that the consumer can stop doing business with Defendants and reject any offer obtained by the Defendants.  16 C.F.R. § 322.4(b)(1) (2010), recodified as 12 C.F.R. § 1015.4(b)(1) (2011).  Furthermore, in written communications, all of these disclosures must appear together and be proceeded by the heading "IMPORTANT NOTICE."  16 C.F.R. § 322.4(a)(3)(i), (b)(4)(i) (2010) recodified as 12 C.F.R. § 1015.4(a)( 3)(i), (b)(4)(i) (2011).  Defendants' mailings, websites, spam emails, and telemarketers fail to provide all of these required enumerated disclosures in a clear and prominent manner and fail to provide the required heading.  *See supra* Part IV.G.

### d.  Defendants' efforts to avoid the advance fee ban are unavailing.

Defendants attempt to avoid the advance fee ban in two ways, neither of which is successful.  First, Defendants have attempted to characterize their advance fee as for only a "forensic audit" and not for foreclosure relief or loan modifications.  Second, Defendants affiliate with various attorneys in a misguided attempt to take advantage of attorney exemptions in the CFPA and Regulation O.

### i.  Defendants cannot circumvent the advance fee ban by purporting to charge consumers only for "forensic audits."

Defendants structure their program in a failed attempt to circumvent Regulation O. On paper, consumers are paying for a report – variously called a "forensic audit" or "securitization audit" – rather than for foreclosure relief or a mortgage modification.  As explained *supra* Part IV.E, even though Defendants' representations in their mailers, websites, spam emails, and telemarketing promise struggling homeowners that Defendants can prevent foreclosure or obtain a mortgage loan modification, Defendants' contracts with consumers commonly state that their advance fee is for a forensic audit,

with no mention of foreclosure relief or mortgage relief.  This sleight of hand is ineffective, for two reasons.

First, "forensic audits," are covered by Regulation O's ban on advance fees.  As explained *supra* Part II, in promulgating the MARS Rule, the FTC observed that many mortgage assistance relief service providers were offering "forensic audits" in an attempt to circumvent state-law bans on advance fees.  Accordingly, the FTC was explicit that the term "mortgage assistance relief services" includes "'forensic audits' and other services in which the provider purports to review and identify potential errors in loan documents or documents sent by a consumer's lender or servicer in order to avert foreclosure or obtain concessions from the lender or servicer." 75 Fed. Reg. at 75,100 n.110; *see also id.* at 75,096 (further defining "forensic audits" as when "attorneys purportedly conduct a legal analysis of mortgage loan documents to find law violations, thereby supposedly helping consumers acquire leverage over their lenders or services to obtain a better loan modification").  That is precisely what Defendants' forensic audits purport to do.  *See supra* Part IV.E.

Second, in any case, Defendants represent to consumers that they will obtain mortgage relief for them, not merely provide them with a "forensic audit."  Aleman, Ex. 17 ¶ 5; Blanks, Ex. 15 ¶ 3; Boatwright, Ex. 13 ¶ 12; Collins, Ex. 18 ¶ 9; Davis, Ex. 16 ¶ 5; Folsom, Ex. 14 ¶ 8.  Defendants' core misrepresentation to consumers is that they will receive mortgage relief, including foreclosure relief and loan modifications, which are services unquestionably subject to Regulation O's ban on advance fees.  *See supra* Part IV.A (describing references to mortgage relief in Defendants' spam emails, direct mailers, telemarketing training manual, and websites).

Accordingly, the Bureau is likely to prove that Defendants' practice of collecting advance fees is illegal, notwithstanding their purported provision of forensic audits.

### ii. Defendants' strategy of affiliating with attorneys does not exempt them from Regulation O or the CFPA.

Both the CFPA and Regulation O provide for attorney exemptions in certain circumstances.  12 U.S.C. § 5517(e); 16 C.F.R. § 322.7 (2010), recodified as 12 C.F.R. § 1015.7 (2011).  Notwithstanding the fact that Defendants have affiliated with various attorneys, neither exemption applies in this case.

Under the CFPA, activities "engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law" are generally exempt from the Bureau's enforcement authority.  12 U.S.C. § 5517(e)(1).  However, if the attorney is offering or providing consumer financial products or services, the exclusion only applies if the attorney offers such product or service (1) "as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship"; or (2) with respect to a consumer who is "receiving legal advice or services from the attorney in connection with such financial product or service."  12 U.S.C. § 5517(e)(2).

The CFPA attorney exemption does not apply in this case.  First, the Bureau is not concerned with activities engaged in "by an attorney"; neither Defendant Jalan nor Defendant Nelsen is an attorney, and there is no indication that Defendants' illegal conduct was undertaken by attorneys.  Second, Defendants' conduct does not occur in states where Defendants' affiliated attorneys are licensed to practice.  Pritchett, Ex. 6 ¶¶ 4, 6, 8; Collins, Ex.17, Attach. B; Davis, Ex. 16 ¶ 26; Van Dyke, Ex. 11, Attach. E.  Third, because consumers report never speaking with an attorney, having an attorney-client relationship, or receiving legal services, Defendants' conduct cannot be considered "part of the practice of law" even in the states where the affiliated attorneys are licensed.  *See supra* Part IV.C.  Finally, the CFPA authorizes the Bureau to bring enforcement actions against an attorney to the extent that such attorney is otherwise subject to any of

the enumerated consumer laws, including the 2009 Omnibus Appropriations Act, pursuant to which Regulation O was promulgated.  12 U.S.C. § 5517(e)(3); *see also* 12 U.S.C. §§ 5538, 5481(12)(Q).

Defendants also do not qualify for the attorney exemption within Regulation O. Except for the advance fee ban, an attorney is exempt from Regulation O if the attorney: (1) provides "mortgage assistance relief services as part of the practice of law"; (2) "is licensed to practice law in the state" in which the consumer or the consumer's dwelling is located; and (3) complies "with state laws and regulations relating to the same general types of conduct the rule addresses."  16 C.F.R. § 322.7(a) (2010), recodified as 12 C.F.R. § 1015.7(a) (2011).  In order to be exempt from the advance fee ban, an attorney must also:  (1) deposit any funds received from the consumer in a client trust account prior to performing legal services; and (2) comply "with all state laws and regulations, including licensing regulations, applicable to client trust accounts."  16 C.F.R. § 322.7(b) (2010), recodified as 12 C.F.R. § 1015.7(b) (2011)  (2011).  As discussed above, the individual Defendants are not attorneys.  Moreover, Defendants' affiliated attorneys are not licensed to practice law in many of the states where Defendants' consumers or their dwellings are located, and the attorneys do not provide mortgage assistance relief services as part of the practice of law.  Defendants' attorneys also do not appear to have deposited funds into client trust accounts.  Pritchett, Ex. 6 ¶ 37, Attach. SS at 612-33. Accordingly, Defendants are not exempt from any provisions of Regulation O.

## 2.  The balance of hardships supports a TRO.

The second factor in the issuance of a TRO, the balance of hardships, overwhelmingly favors the Bureau.  The Bureau was created to regulate the offering and provision of consumer financial products or services in order to protect consumers. Indeed, the Bureau's statutory mandate specifically includes protecting consumers from deceptive mortgage assistance relief service providers and ensuring that such providers comply with the CFPA and Regulation O.  *See supra* Part II.  Defendants continue to

harm consumers every day and have no legitimate interest in continuing their unlawful conduct.  *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) ("[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment.").  Accordingly, the balance of hardships favors the Bureau because the Bureau seeks to protect the public by putting an immediate halt to Defendants' continuing harm and returning to consumers the money they lost.

### 3.  Irreparable injury is likely without an injunction.

Furthermore, there is a likelihood of irreparable injury if the Court does not issue the injunction.  In law enforcement actions such as this one – as opposed to matters between private litigants – irreparable injury is presumed where an injunction is authorized by statute, the statutory conditions are satisfied, and the injunction is sought by the agency with which enforcement has been entrusted.  *See United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175-76 (9th Cir. 1987); *SEC v. Credit First Fund, LP*, No. CV 05-8741DSFPJWX, 2006 WL 4729240, at *2 (C.D. Cal. Feb. 13, 2006) (citation omitted).  In this case, the CFPA authorizes an injunction, Defendants are subject to the CFPA, and the Bureau, as the agency charged with enforcing the CFPA, seeks an injunction to protect consumers from acts prohibited by the CFPA.  In addition, those consumers whom the agency is charged with protecting are likely to suffer irreparable injuries, because consumers continue to lose money and their homes as a result of Defendants' scheme.

### 4.  An injunction is in the public interest.

The public has an interest in halting mortgage relief scams and being protected from further harm resulting from Defendants' sham businesses.  Moreover, the public interest demands that Defendants' scam be stopped and Defendants' assets be preserved to redress harmed consumers.  *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236

(9th Cir. 1999) ("the public interest in preserving the illicit proceeds of the . . . [scheme] for restitution to the victims is great").

### C. Individual Defendants Jalan and Nelsen Are Liable for Their Violations of the CFPA and Regulation O.

Under the CFPA, Defendants Jalan and Nelsen are "covered persons" who are liable for their unlawful acts and practices.  As noted above, the CFPA provides that "[i]t shall be unlawful for any covered person . . . to engage in any . . . unfair [or] deceptive . . . act or practice."  12 U.S.C. § 5536(a)(1)(B); *see also* 12 U.S.C. § 5531(a).  A "covered person" means any person, including any individual, who engages in "offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A) and (19).  Under the CFPA, financial advisory services, including services to assist consumers with modifying a mortgage and avoiding foreclosure, are consumer financial products and services.  12 U.S.C. § 5481(15)(A)(viii)(II).  Similarly, Defendants Jalan and Nelsen are "mortgage assistance relief service providers" because they are persons engaged in the provision of "mortgage assistance relief services" as those terms are defined in Regulation O.  16 C.F.R. § 322.2(i), (j) (2010), recodified as 12 C.F.R. § 1015.2 (2011).

In this case, Defendants Jalan and Nelsen are undoubtedly engaged in offering or providing mortgage assistance relief services, both individually and through NLHC, the corporation they control.  Both Jalan and Nelsen communicate directly with consumers and make numerous misrepresentations to them.  Blanks, Ex. 15 ¶¶ 16-17 (emails with "Rick Nelson" and "Sarah Johnson"); Boatwright, Ex. 13 ¶¶ 4, 29 (emails with "Sarah St. John" and "Rick Nelson"); Collins, Ex. 18 ¶ 13 (emails from "Rick Nelson"); Davis, Ex. 16 ¶ 24 (emails with "Sarah L. Johnson"); Folsom, Ex. 14 ¶ 16 (emails with "Sarah L. Johnson"); Morgan, Ex. 22 ¶ 21 (emails with "Sarah Johnson"); Weber, Ex. 7 ¶¶ 6, 13 (correspondence with "Sarah St. John" and "Rick Nelson").  They both materially participate in the scheme and have roles organizing, managing, and controlling NLHC,

including registering NLHC as a corporation and applying for various FBNs.  Cal. SOS, Ex. 1, at 42, 44, 45; OC FBNs, Ex. 3, at 86, 88, 98, 102, 104.  Jalan and Nelsen are the corporate officers of NLHC with managerial responsibility for the company.  Both Nelsen and Jalan are signatories on NLHC bank accounts, obtained or paid for domain names, and obtained or paid for telecommunications services.  Dobkin, Ex. 9 ¶ 3; Pritchett, Ex. 6, Attachs. LL, MM, NN, OO, PP, QQ, RR, SS, TT.

### D. An *Ex Parte* TRO Freezing Defendants' Assets and Appointing a Temporary Receiver Is Necessary To Prevent the Highly Likely Dissipation of Assets and Preserve Funds for Effective Final Relief for Consumers.

To preserve assets and evidence and to immediately halt Defendants' violative conduct, the Bureau seeks an *ex parte* TRO and requests that the Court freeze Defendants' assets, appoint a temporary receiver, and grant immediate access to Defendants' business premises.[2]  As discussed above, the CFPA authorizes the Bureau to seek permanent or temporary injunctions and authorizes a court to grant the relief sought

---

[2] In FTC actions, courts have granted a variety of provisional remedies, including a TRO, preliminary injunction, asset freeze, immediate access, and appointment of a receiver. *See, e.g.*, *World Wide Factors*, 882 F.2d at 346 (TRO, preliminary injunction, asset freeze); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1021 (7th Cir. 1988) (TRO, preliminary injunction, asset freeze).  In addition, many courts, including in the Ninth Circuit and this district, have granted such relief on an *ex parte* basis.  *See, e.g.*, *Affordable Media*, 179 F.3d at 1232 & n.2 (*ex parte* TRO, asset freeze, financial reporting, preliminary injunction); *FTC v. Forensic Case Mgmt. Servs., Inc.*, No. 2:11-cv-07484-RGK-SS (C.D. Cal. Sept. 13, 2011) (*ex parte* TRO, asset freeze, appointment of receiver, access to premises); *FTC v. Health Care One LLC*, No. SACV 10-1161 JVS (RNBx) (C.D. Cal. Aug. 3, 2010) (*ex parte* TRO, asset freeze, appointment of receiver, access to premises); *FTC v. Lucas Law Ctr., Inc.*, No. SACV 09-0770 DOC(ANx) (C.D. Cal. July 9, 2009) (*ex parte* TRO, asset freeze, appointment of receiver, access to premises); *FTC v. EDebitpay, LLC*, No. 07-cv-4880-ODW(AJWx) (C.D. Cal. July 30, 2007) (*ex parte* TRO, asset freeze, appointment of receiver, access to premises).

here, including restitution, disgorgement of ill-gotten gains, and limits on the activities or functions of a defendant.  12 U.S.C. §§ 5564(a), 5565(a)(2).

Once the Bureau invokes a court's equitable powers, the full breadth of the court's authority is available, including the power to grant such additional preliminary relief as is necessary to preserve the possibility of providing effective final relief.  *See FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982).  When the public interest is at stake, as here, the exercise of the court's broad equitable authority is particularly appropriate. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S. Ct. 1086, 90 L. Ed. 1332 (1946) (when the public interest is implicated, the court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake"); *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 857 (9th Cir. 1995).  Such ancillary relief may include an asset freeze and the appointment of a receiver.  *See SEC v. Presto Telecomms., Inc.*, 153 F. App'x 428, 430 (9th Cir. 2005) (upholding district court "invoking its inherent equitable power to appoint a receiver and freeze [individual defendant's] assets as a form of ancillary relief").  In the Central District of California, one recent Bureau case and three recent FTC cases involving mortgage assistance relief services sought and obtained the same relief sought here.  *CFPB v. Gordon*, No. CV12-06147 (C.D. Cal. Nov. 16, 2012) (Lew, J.); *FTC v. Consumer Advocates Grp. Experts, LLC*, No. CV12-04736 (C.D. Cal. May 30, 2012) (Pregerson, J.); *FTC v. Lakhany*, No. CV12-00337 (C.D. Cal. Mar. 7, 2012) (Carney, J.); *FTC v. Am. Mortg. Consulting Grp.*, No. 8:12-cv-01561 (C.D. Cal. Sept. 18, 2012) (Carter, J.).

### 1.  This case warrants *ex parte* relief.

*Ex parte* relief is warranted in this case to ensure that Defendants' assets are preserved for consumers' redress and to protect consumers from further injury.  *See* Fed. R. Civ. P. 65(b) (*ex parte* relief is warranted if "immediate and irreparable injury, loss, or

damage will result to the movant before the adverse party can be heard in opposition");
Boison, Ex. 24.[3]  An *ex parte* TRO serves the "underlying purpose of preserving the
status quo and preventing irreparable harm."  *Granny Goose Foods, Inc. v. Teamsters*,
415 U.S. 423, 439, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974).[4]

Courts grant *ex parte* TROs in two circumstances applicable here:  likely
dissipation or concealment of assets, *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d
1091, 1092 (9th Cir. 2010), and likely disregard of a court order.  *Reno Air Racing Ass'n,
Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).  *Ex parte* relief is appropriate in
this case for both of these reasons.

First, Defendants are likely to dissipate or conceal assets if they receive notice
before an order is entered.  Bank records reveal that Defendants Jalan and Nelsen use
business bank accounts as personal piggy banks, routinely paying, *inter alia*, their
personal rent, student loan bills, and probation fees out of those accounts.  Dobkin, Ex. 9
¶ 6.  They also regularly use funds in their business accounts for international travel,
near-daily restaurant bills, clothing, and large cash withdrawals, including withdrawals of
up to $10,000 in cash at a time, followed by a $6,000 cash withdrawal within the same
week, and ATM withdrawals in Tajikistan.  *Id.* ¶¶ 6, 7.  Such cash withdrawals from

---

[3]  Moreover, Local Rule 7-19.2 allows this Court to waive the notice requirement of
Local Rule 7-19.1 if such waiver would be in the interests of justice.

[4]  *See also CFTC v. Abad*, No. CV08-01352, 2008 WL 5661885 (C.D. Cal. Dec. 1, 2008)
(entering *ex parte* statutory restraining order with asset freeze); *SEC v. Private Equity
Mgmt. Grp., Inc.*, No. CV09-2901, 2009 WL 2058247, at *1 (C.D. Cal. July 9, 2009)
(noting that court granted *ex parte* TRO); *SEC v. Homestead Props., L.P.*, No. CV09-
01331, 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18, 2009) (noting that court entered *ex
parte* TRO with asset freeze and receiver); *FTC v. Consumer Advocates Grp. Experts,
LLC*, No. CV12-04736 (C.D. Cal. May 30, 2012) (court entered *ex parte* TRO with asset
freeze and receiver); *FTC v. Lakhany*, No. CV12-00337 (C.D. Cal. Mar. 7, 2012) (same);
*FTC v. Am. Mortg. Consulting Grp.*, No. 8:12-cv-01561 (C.D. Cal. Sept. 18, 2012)
(same).

company accounts are highly unlikely to be for business expenses.  Furthermore, on July 14, 2012, Defendant Jalan posted a picture on her Facebook page showing approximately $10,000 in cash spread across a table, apparently in her apartment.  Lewis, Ex. 5, Attach. C.

Second, it is likely that Defendants will disregard a court order, since they have continued to operate their scheme in the face of federal and state attention.  Indeed, Defendants are repeat offenders:

- They have continued to operate websites using Treasury marks and variations thereof, despite having received cease-and-desist letters from Treasury's Office of Financial Stability on July 27, 2012.  They have also failed to comply with the Treasury's directive, in those letters, to transfer domain names using Treasury marks – such as makinghomeaffordable.ca and hampriskdepartment.org – to Treasury.  Wade, Ex. 19 ¶¶ 12-13, Attach. B.  Indeed, they recently relaunched makinghomeaffordable.ca and have continued using that domain name in emails to consumers.  Pritchett, Ex. 6, Attach. II; Folsom, Ex. 14 ¶ 31.

- They continue to reference the OCC in their marketing efforts, including representing that the OCC has directed NLHC to send correspondence to consumers, notwithstanding the OCC's issuance of an alert, on March 16, 2012, stating that "the program does not appear to be legitimate and is instead likely an 'up-front-fee scam.'"  *See supra* Part IV.B; Pritchett, Ex. 6, Attach. GG.  The OCC's press release was titled, "Misrepresentation of Involvement by the Office of the Comptroller of the Currency in Independent Foreclosure Grant Review Scam."  Pritchett, Ex. 6, Attach. GG.  Eleven days later, Defendant Jalan registered the domain name misrepresentationofinvolvementbytheofficeofthecomptroller.com and the

same domain name at .biz, .mobi, .info, .co, .me, .org, and .net.  *Id.*, Attach. LL at 417-18.

- On June 1, 2011, Defendants received a cease-and-desist letter from the North Carolina Attorney General, yet they continue to reach out to consumers in North Carolina.  Pritchett, Ex. 6 ¶ 32, Attach. VV at 756.

- The Oregon Department of Justice sent a cease-and-desist letter to Defendants on October 7, 2010, but Defendants continue to reach out to consumers in Oregon.  Pritchett, Ex. 6 ¶ 32, Attach. UU at 733.

### 2.  The Court should freeze Defendants' assets.

The Bureau seeks restitution for the victims of Defendants' scheme.  To preserve the possibility of such relief, the Bureau asks that the Court freeze Defendants' assets and order an immediate accounting to prevent concealment or dissipation of assets pending a final resolution.  In cases such as this, where the plaintiff establishes that it is likely to succeed on the merits and the defendants are likely to dissipate assets, an asset freeze is appropriate.  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).  Where the Bureau is likely to succeed in showing that an individual is liable, the freeze should extend to individual assets as well.  *See, e.g.*, *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1112 (9th Cir. 2006) (district court froze individuals' assets); *Affordable Media, LLC*, 179 F.3d at 1228, 1236-37 (upholding freeze of individuals' assets).[5]

A freeze of Defendants' assets is appropriate here to preserve the status quo, ensure that funds are not dissipated during the course of this action, and preserve Defendants' assets for consumer redress.  Defendants' unfair and deceptive practices

---

[5] *See also World Travel Vacation Brokers, Inc.*, 861 F.2d at 1031 (same); *Private Equity Mgmt. Grp., Inc.*, 2009 WL 2058247, at *2-*3 (court froze individual assets); *FTC v. Consumer Advocates Grp. Experts, LLC*, No. CV12-04736 (C.D. Cal. May 30, 2012) (same).

have garnered scores of consumer complaints and drawn the attention of state and federal law enforcement authorities. *See supra* Part V.D.1. Indeed, defendants who have engaged in deception may be considered likely to waste assets prior to resolution of the action. *See SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1106 (2d Cir. 1972). Moreover, as previously discussed, the contents of Defendants' business bank accounts are repeatedly depleted due to Defendants Jalan and Nelsen's use of them as their personal accounts. *See supra* Part V.D.1. Accordingly, an asset freeze is necessary to preserve the funds derived from Defendants' unlawful activities and prevent Defendants' continued misuse of consumers' money.

### 3. The Court should appoint a temporary receiver.

The appointment of a temporary receiver for NLHC is critical. In cases where a corporate defendant, through its management, has deceived members of the public, "it is likely that in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of the deception's victims. *SEC v. First Fin. Grp.*, 645 F.2d 429, 438 (5th Cir. 1981). In similar FTC and SEC enforcement actions, courts frequently appoint temporary receivers for corporate defendants that use deception to obtain money from consumers. *See, e.g.*, *JT Wallenbrock & Assocs.*, 440 F.3d at 1112 (district court appointed receiver); *CFTC v. Forex Liquidity LLC*, No. CV 07-01437, 2009 WL 2231684, at *1 (C.D. Cal. July 23, 2009) (court appointed receiver); *FTC v. Consumer Advocates Grp. Experts, LLC*, No. CV12-04736 (C.D. Cal. May 30, 2012) (receiver appointed); *FTC v. Lakhany*, No. CV12-00337 (C.D. Cal. Mar. 7, 2012) (same); *FTC v. Am. Mortg. Consulting Grp.*, No. 8:12-cv-01561 (C.D. Cal. Sept. 18, 2012) (same).

Appointment of a receiver is particularly appropriate here because Defendants' deceptive scheme demonstrates such an indifference to the law that both the individuals and the corporation may reasonably be expected to frustrate the Bureau's law enforcement efforts by destroying evidence and concealing or dissipating assets. A

1  receiver can monitor the use of Defendants' assets, marshal and preserve records, identify

2  assets, identify and segregate any attorney-client privileged materials, determine the size

3  and extent of the enterprise, identify additional consumers who were injured, and

4  repatriate foreign assets.  Moreover, in light of Defendants' persistent and knowing

5  violations, as discussed above, appointment of a receiver is a reasonable way for the

6  Court to ensure that Defendants cease their unlawful conduct and to preserve their assets

7  pending a permanent resolution of this case.  The repeated use of Defendants' business

8  bank accounts for overseas travel, including the withdrawal of funds in Tajikistan,

9  especially suggests that a receiver may be necessary in order to repatriate assets.

10        The Bureau recommends that the Court appoint Howard I. Camhi of Ervin Cohen

11  & Jessup LLP as temporary receiver for NLHC.  In the alternative, if the Court would

12  prefer a list of potential receivers, the Bureau will provide such a list.  Mr. Camhi's

13  qualifications are set forth in the Bureau's Recommendation for Temporary Receiver,

14  filed separately with this Motion.

15  **VI.    CONCLUSION**

16        Defendants have caused and likely will continue to cause substantial public

17  injury by violating the CFPA and Regulation O.  The Bureau respectfully requests the

18  proposed TRO on an *ex parte* basis to protect the public from further harm and help

19  ensure effective relief for those harmed.

20

21  Dated:  December 3, 2012                    Respectfully submitted,

22

23                                             Kent Markus
                                               Enforcement Director
24

25                                             Elizabeth Boison
                                               (Email: elizabeth.boison@cfpb.gov)
26                                             (Phone: 202-435-7369)
                                               Melanie Hirsch
27

28                                             38

(Email: melanie.hirsch@cfpb.gov)
(Phone: 202-435-7944)
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau